**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**MOHAMED A. HAFEZ,**

                                        **Plaintiff,**

        **vs.**                                                **1:10-cv-541**
                                                               **(MAD/DRH)**

**CITY OF SCHENECTADY, BRIAN U.**
**STRATTON, KEITH LAMP, DOMENIC**
**VISCARIELLO and ELISA WICKHAM,**

                                        **Defendants.**
_____

**APPEARANCES:**                               **OF COUNSEL:**

**MOHAMED A. HAFEZ**
1151 Crane Street
Schenectady, New York 12303
Plaintiff *pro se*

**CARTER, CONBOY, CASE, BLACKMORE,**          **MICHAEL J. MURPHY, ESQ.**
**MALONEY & LAIRD, P.C.**
20 Corporate Woods Boulevard
Albany, New York 12211
Attorneys for defendants

**Mae A. D'Agostino, U.S. District Judge:**

**MEMORANDUM-DECISION AND ORDER**

**I. INTRODUCTION**

        On May 10, 2010, plaintiff *pro se* commenced this action by the filing of a Summons and

Complaint, in which he alleged claims of retaliation in violation of his First Amendment rights,

unlawful search and seizure in violation of his Fourth Amendment rights, selective enforcement

in violation of the Equal Protection Clause of the Fourteenth Amendment, and a state-law cause

of action for intentional infliction of emotional distress. *See* Dkt. No. 1 at ¶¶ 48-51, 54-57.

Plaintiff also alleged that Section 210 of the Code of Ordinances of the City of Schenectady (the

"Code") is unconstitutional and that defendant Schenectady's requirement that a landlord obtain a rental certificate for each apartment that he rents has been unfairly enforced against him for a variety of reasons, including his prior tax grievances and his "newcomer" status in Schenectady. *See id.* at ¶¶ 52-53.

On June 27, 2011, plaintiff moved for a temporary restraining order and a preliminary injunction "enjoining the defendants and the City of Schenectady's code enforcement officers during the pendency of his action from retaliating against, or harassing, me or enforcing the Schenectady Rental Certificate Ordinance against me, my properties or my business during the pendency of this case, because the Ordinance is unconstitutionally vague and I am being irreparably harmed from the arbitrary and discriminatory enforcement of the Ordinance which inhibits the exercise of my First Amendment constitutional rights." *See* Dkt. No. 38-1 at 1. On June 28, 2011, the Court denied plaintiff's motion for a temporary restraining order but ordered defendants to show cause "why a preliminary injunction should not be entered enjoining defendants during the pendency of his action from enforcing Section 210 of the Code of Ordinances, City of Schenectady, against plaintiff, and any further relief that the Court may deem proper[.]" *See* Dkt. No. 39.

Currently before the Court is plaintiff's motion for a preliminary injunction.

## II. BACKGROUND

### A.    Relevant statutory provisions

On October 9, 2007, the Council of the City of Schenectady enacted Section 210 of the Code of Ordinances of the City of Schenectady. *See* Dkt. No. 42-8. The Council provided that

> [t]he purpose of this chapter is to establish a procedure and standards for the identification and registration of rental properties,

> to ensure that the City has a meaningful, efficient and effective
> means of communicating with those persons and companies who
> own rental properties, to provide for the inspection of certain
> residential rental property when there is a change in occupancy, and
> to fix the responsibilities on owners to ensure that residential rental
> property is maintained in accordance with the standards set forth in
> this chapter and the building and property maintenance codes
> promulgated by the New York State Department of State.  This
> chapter is adopted to promote the health and safety of tenants and to
> alleviate conditions of substandard housing, including slums and
> blight.

*See id.* at § 210-1.

In pursuit of these goals, the Code requires that each owner obtain a "valid rental certificate or temporary rental certificate" prior to permitting an apartment to be occupied (the "rental certificate ordinance" or "ordinace").  *See id.* at § 210-6 – 210-8.[1]  Specifically, the Code provides that, "[w]henever a vacancy shall exist in a rental unit and a leasing is about to occur, or whenever there is a change in occupancy, the owner shall submit a written application for a rental certificate.  This application shall indicate the name and address of the owner, the location of the property and the identity of the rental unit by number or other suitable means."  *See id.* at § 210-8(A)(2).[2]  Thereafter, within five (5) days of receipt of the rental certificate application, defendant Schenectady's building inspector shall inspect the rental unit to determine if it is in compliance

---

[1] The rental certificate requirement applies only to buildings with two or more rental units, unless those rental units are inspected and leased under contract to the Schenectady Municipal Housing Authority and the United States Department of Housing and Urban Development.  *See* Dkt. No. 42-8 at § 210-8(A)(1).

[2] A rental certificate is valid until, among other things, it is revoked by the Building Inspector or until there is a change in the occupancy of the apartment.  *See* Dkt. No. 42-8 at § 210-10.

with specified portions of the Code that relate to safety and health concerns for the tenants.  *See id.* at § 210-8(A)(3).[3]

To enforce the above sections, "[d]uring regular business hours or in an emergency, the Building Inspector or his representative or any duly authorized City representative, upon the showing of proper credentials and in the discharge of his duties, may enter any building or rental unit within a building."  *See id.* at § 210-9(A).  Moreover, "[a]t the request of the Building Inspector, the Corporation Counsel is authorized to make application to the City Court of the City of Schenectady or any other court of competent jurisdiction for the issuance of a search warrant to be executed by a police officer in order to conduct an inspection of any premises believed to be subject to this chapter."  *See id.* at § 210-9(B).  Further, "[t]he Building Inspector may seek a search warrant whenever the owner, managing agent or occupant fails to allow inspections of any dwelling unit contained in the rental property where there is a reasonable cause to believe that there is a violation of this chapter, or a violation of the New York Uniformed Building Code Act or of any code of the City of Schenectady or any applicable fire code."  *See id.*  The fee for the inspection and issuance of a rental certificate is $50, $25 for each subsequent reinspection, but "[t]he fee for the issuance of a rental certificate whenever an owner fails to submit an application for a rental certificate as required by this chapter prior to renting a unit is $100."  *See id.* at § 210-14(A), (B).

If a landlord violates the provisions at issue in the present matter, he may be subject to a fine and may potentially face misdemeanor prosecution.  *See id.* at § 210-18(B).  Specifically, the provision provides as follows:

---

[3] Without setting forth the entire Code, the standards include, but are not limited to, lighting, ventilation, access, heating, electrical, and fire protection.  *See* Dkt. No. 42-8 at § 210-8(A).

(1) A violation of Article III of this chapter shall be an offense and shall be punishable by a fine of not less than $150 and not exceeding $250, or by a civil penalty of not less than $250. A separate offense shall be deemed committed on each day on which a violation occurs or continues.

(2) A second, independent violation of Article III during an eighteen-month period, and any willfully, intentional and knowingly made violation of Article III, shall be a Class A misdemeanor and shall be punishable by a fine of not less than $500 and not exceeding $1,000 and a period of incarceration of not less than ten (15)[4] days, nor exceeding one year. A separate offense shall be deemed committed on each day on which a violation occurs or continues.

*See id.*

## B.      Underlying conduct

In his complaint, plaintiff alleges that, on October 1, 2009, defendants Viscariello and Wickham entered his private shop, at 727 Crane Street, Schenectady, New York, without a search warrant. *See* Dkt. No. 1 at ¶ 8. These defendants then proceeded to threaten plaintiff and defendant Wickham specifically threatened to "shut down" the building. *See id.* Later in the afternoon on October 1, 2009, defendants Viscariello and Wickham went to plaintiff's business address at 1151 Crane Street, in Schenectady, New York, and again threatened plaintiff. *See id.* at ¶ 9. Plaintiff alleges that defendant Viscariello cited plaintiff with two code violations, but the charges were later dismissed. *See id.* at ¶ 10. Plaintiff alleges that other instances of harassment occurred for the next several months, which led to additional code violations being brought

---

[4] It is unclear whether defendant Schenectady intended for the punishment not to exceed ten (10) or fifteen (15) days when found guilty of such a misdemeanor. Both versions of the Code contain this same typographical error. *See* Dkt. No. 38-1 at § 210-18(B); Dkt. No. 42-8 at § 210-18(B). This error, however, has no bearing on the disposition of the motion presently before the Court.

against him.  *See id.* at ¶¶ 13-20.  Plaintiff contends that these code violations were filed against

him in retaliation for his complaints of selective and arbitrary enforcement of Schenectady's

zoning ordinance and because he filed several tax grievances with defendant Schenectady.  *See id.*

at ¶¶ 17-18.

Specifically, plaintiff alleges that defendants arbitrarily required him to apply for a rental

certificate for his building at 727 Crane Street, which only has one rental unit.  *See id.* at ¶¶ 18-

19.  Moreover, he alleges that he "was coerced by the defendants into applying for a rental

certificate with the threats of criminal prosecution, fines and loss of income."  *See id.* at ¶ 19.

Moreover, plaintiff claims that, "[w]ithout due process, [he] was charged $100 on October 7th,

2009, double the inspection fee, and $277.77 in fines were added to the property's tax bill."  *See*

*id.*  Plaintiff claims that the prior owner of the property was not required to obtain a rental

certificate, which further shows that defendants actions were taken in retaliation against him for

speaking out against the city's selective code enforcement.  *See id.* at ¶ 20.

Thereafter, on February 18, 2010, plaintiff claims that defendant McDonald failed to issue

three rental certificates for apartments in his 1151 Crane Street property.  *See id.* at ¶ 21.  Plaintiff

asserts that defendant McDonald showed up late for his appointment, was menacing, and

threatened to deny all three rental certificates.  *See id.*  Due to his menacing behavior, plaintiff

asked defendant McDonald to leave and denied him entry to his business office.  *See id.*  On

February 19, 2010, defendant McDonald sent a "Notice of Prosecution" to plaintiff for not having

rental certificates for the three apartments that he was supposed to inspect the previous day.  *See*

*id.* at ¶ 22.

Then, on February 24, 2010, plaintiff sent to defendant Stratton a complaint regarding

defendant McDonald's conduct.  By letter dated March 26, 2010, defendant Lamp replied to

plaintiff's complaint and wrote that "there appears to be extreme differences in what happened" and added that the three rental certificates were denied because the property's basement was not inspected. *See id.* at ¶ 24.

By letter dated April 27, 2010, plaintiff claims that a different code enforcement officer cited him for a violation at his property located at 1671 Broadway. *See id.* at ¶ 25. Plaintiff contends that this was cited as a violation of "Article III, Section 210-6, of the Code of Ordinances." *See id.* Plaintiff claims that he was coerced into applying for a rental certificate for that apartment through threats of fines and incarceration, in violation of his "First Amendment property and liberty rights." *See id.*

Plaintiff alleges that similar instances have occurred from 2006 through the present. *See id.* at ¶¶ 26-33. Moreover, plaintiff seems to indicate that this unconstitutional conduct is partially caused by the lack of proper training that defendant Schenectady's code enforcement officers receive. *See id.* at ¶¶ 34-36. Moreover, he claims that he has been subjected to selective enforcement of the building code, which is in part in retaliation for his First Amendment activities, such as challenges to his tax assessment, speaking out against public officials, and petitioning the government and elected officials for redress of grievances. *See id.* at ¶¶ 37-39, 44. Plaintiff asserts that defendants' retaliatory and unconstitutional conduct has caused him to stop exercising his First Amendment rights. *See id.* at ¶ 43.

**C.** **Plaintiff's motion for a temporary restraining order and preliminary injunction**

Plaintiff filed the present motion "because of the imminent threat of criminal prosecution by the defendants as they have sent me three violation notices dated June 13, 2011 for violating the Schenectady Rental Certificate Ordinance." *See* Dkt. No. 38-1 at ¶ 2. In support of his

motion, plaintiff claims that the rental certificate ordinance (1) is unconstitutionally vague and discretionary; (2) is being selectively enforced against him in retaliation for exercising his First Amendment rights; (3) is coercive as applied to him; and (4) fails to provide him an impartial review of the building inspector's decisions.

In response to plaintiff's motion, defendants submitted the affidavit of Louis D. Paniccia, a Code Enforcement Officer with the City of Schenectady. *See* Dkt. No. 42-7. Mr. Paniccia claims that, on or about June 10, 2011,[5] he received a telephone complaint regarding mold in apartment 6 at 1151-59 Crane Street. *See id.* at ¶ 8. Mr. Paniccia asserts that the complainant identified himself as the father of the tenant of apartment 6, and this complainant later appeared at the building inspector's office and provided pictures of the apartment. *See id.* at ¶¶ 9-11. After receiving this complaint, Mr. Paniccia sought to determine whether a rental certificate had been issued for 1151-59 Crane Street. *See id.* at ¶ 13. Mr. Paniccia determined that, on February 18, 2010, rental certificates had been issued for apartments 5, 6 and 7, but further discovered that no rental certificates were on file for apartments 2, 3 or 4. *See id.* at ¶¶ 14-15. Moreover, Mr. Paniccia determined that, on February 19, 2010, Code Enforcement Officer Bruce McDonald denied rental certificates for apartments 2, 3 and 4. *See id.* at ¶ 16.

Thereafter, Mr. Paniccia claims that his inspection of 1151-59 Crane Street on June 10, 2011, revealed that apartments 2, 3 and 4 were occupied by residential tenants. *See id.* at ¶ 17. Since this was a violation of section 210-6 of the Code of the City of Schenectady, on June 13, 2011 Mr. Paniccia issued plaintiff notices of violation for 1151-59 Crane Street for his failure to

---

[5] Although Mr. Paniccia repeatedly states that he received this telephone complaint and pictures of the apartment on June 10, 2010, it is clear that this is simply a typographical error and should read June 10, 2011. This is supported by the fact that he indicated that he inspected the premises the same day that he received the complaint and because the picture contains a June 9, 2011 date stamp.

have rental certificates for apartments 2, 3, and 4. *See id.* at ¶¶ 18-19. Finally, Mr. Paniccia asserts that, "[a]t the time this complaint was made, [he] was not aware that Mr. Hafez had brought a lawsuit against the City and City employees," and further indicates that his investigation and inspection were conducted solely as a result of a tenant's verbal complaint of a health and safety issue. *See id.* at ¶¶ 20, 23.

In reply, plaintiff claims that his tenant never called him to complain about the condition of his apartment. *See* Dkt. No. 45 at 2. Moreover, plaintiff argues that the "timing of Mr. Paniccia's three rental violation notices is suspect. Mr. Paniccia's notices of June 13, 2011 are only three days from Magistrate Judge David Homer's court order of June 10, 2011 which required the defendants to produce code enforcement documents." *Id.* (citing Docket No. 34). Plaintiff claims that this establishes defendants' bad faith in enforcing the Code provisions against him. *See id.* Finally, plaintiff claims that the threat of criminal prosecution from the three notices of violation is imminent. *See id.* at 3.

## III. DISCUSSION

### A.    Standard of review

A preliminary injunction "is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Moore v. Consol. Edison Co.*, 409 F.3d 506, 510 (2d Cir. 2005) (citation omitted). Furthermore, "[a] decision to grant or deny a preliminary injunction is committed to the discretion of the district court." *Polymer Tech. Corp. v. Mimran*, 37 F.3d 74, 78 (2d Cir. 1994) (citation omitted).

A party seeking a preliminary injunction must establish "'a threat of irreparable injury and either (1) a probability of success on the merits or (2) sufficiently serious questions going to the

merits of the claims to make them a fair ground of litigation, and a balance of hardships tipping decidedly in favor of the moving party.'" *Allied Office Supplies, Inc. v. Lewandowski*, 261 F. Supp. 2d 107, 108 (D. Conn. 2005) (quoting *Motorola Credit Corp. v. Uzan*, 322 F.3d 130, 135 (2d Cir. 2003)). "'When, as here, the moving party seeks a preliminary injunction that will affect government action taken in the public interest pursuant to a statutory or regulatory scheme, the injunction should be granted only if the moving party meets the more rigorous likelihood-of-success standard.'" *Metro. Taxicab Bd. of Trade v. City of N.Y.*, 615 F.3d 152, 156 (2d Cir. 2010) (quotation omitted); *see also Sussman v. Crawford*, 488 F.3d 136, 140 (2d Cir. 2007) (quotation omitted).

Moreover, in certain circumstances, an even higher standard applies. "The moving party must make a 'clear' or 'substantial' showing of a likelihood of success where (1) the injunction sought 'will alter, rather than maintain, the status quo'- *i.e.*, is properly characterized as a 'mandatory' rather than 'prohibitory' injunction; or (2) the injunction sought 'will provide the movant with substantially all the relief sought, and that relief cannot be undone even if the defendant prevails at a trial on the merits.'" *Jolly v. Coughlin*, 76 F.3d 468, 473 (2d Cir. 1996) (quoting *Tom Doherty Assocs., Inc. v. Saban Entertainment, Inc.*, 60 F.3d 27, 33-34 (2d Cir. 1995).[6]

---

[6] As the Second Circuit has noted, "'[t]he distinction between mandatory and prohibitory injunctions is not without ambiguities or critics,' . . . and that in a close case an injunction can be framed in mandatory or prohibitory terms[.]" *Jolly*, 76 F.3d at 473-74 (internal quotations and citation omitted). In the present matter, plaintiff appears to be seeking both mandatory and prohibitory relief. It is unnecessary for the Court to determine the exact nature of plaintiff's request, however, because, as will be discussed below, plaintiff has failed to establish that he is entitled to relief under either standard.

**B.      Likelihood of success on the merits**

Plaintiff has set forth several reasons why he believes that defendants' actions have infringed on his constitutionally protected rights and why be believes that he will ultimately succeed in this matter.  The Court will address the merits of each claim in turn.

### *1. Void for vagueness*

Plaintiff claims that the rental certificate ordinance is unconstitutionally vague because it encourages arbitrary and discriminatory enforcement.  *See* Dkt. No. 38-1 at 12.  Moreover, plaintiff asserts that "the Ordinance gives code officers unlimited discretion, and the Mayor of Schenectady never provided adequate training to code officers on how to enforce the Ordinance without violating landlords' protected constitutional rights."  *See id.*  Plaintiff claims that this is evidenced by the fact that defendant Lamp stated in a letter to plaintiff that basement inspection is required for the issuing of three rental certificates for his apartments, "[b]ut on the same inspection day of [his] building, February 18, 2010, another code officer issued three rental certificates for three different apartments in the same building without requiring the inspection of the basement."  *See id.* at 14.

The Fourteenth Amendment's guarantee that no state shall "deprive any person of life, liberty, or property, without due process of law," U.S. Const. amend. XIV, § 1, entitles a person to "be informed as to what [a law] commands or forbids."  *Thibodeau v. Portuondo*, 486 F.3d 61, 65 (2d Cir. 2007) (citing *Lanzetta v. N.J.*, 306 U.S. 451, 453, 59 S. Ct. 618, 83 L. Ed. 888 (1939)).  The "void-for-vagueness" doctrine requires first that "'laws be crafted with sufficient clarity to "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited"'" and second that laws "contain 'minimal guidelines to govern law enforcement.'"  *Id.* at 65-66

(quoting *Betancourt v. Bloomberg*, 448 F.3d 547, 552 (2d Cir. 2006)) (other quotation omitted); *see also Kolender v. Lawson*, 461 U.S. 352, 358 (1983); *Farid v. Ellen*, 593 F.3d 233, 240 (2d Cir. 2010). A statute or rule is inadequate under the second criterion when it "fails to provide sufficiently explicit standards for those who apply it," and "impermissibly delegates basic policy matters . . . for resolution on an ad hoc and subjective basis." *Farid*, 593 F.3d at 243.

"The Supreme Court has cautioned that this doctrine does not require 'meticulous specificity' from every statute." *Thibodeau*, 486 F.3d at 66 (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 108, 92 S. Ct. 2294, 33 L. Ed. 2d 222 (1972)). "The degree of vagueness that the Constitution tolerates . . . depends in part on the nature of the enactment." *Vill. of Hoffman Estates v. Flipside Hoffman Estates, Inc.*, 455 U.S. 489, 498 (1982). Courts tolerate vagueness in a civil enactment over vagueness in a criminal penalty "because the consequences of imprecision are qualitatively less severe." *Id.* at 498-99. However, where a "statute's literal scope, unaided by a narrowing . . . court interpretation, is capable of reaching expression sheltered by the First Amendment, the doctrine demands a greater degree of specificity than in other contexts." *Smith v. Goguen*, 415 U.S. 566, 573 (1974).[7]

"A statute may be challenged on vagueness grounds either as applied or on its face." *Thibodeau*, 486 F.3d at 67. Although both of these types of vagueness challenges require the inquiry described above, "the two differ in terms of what parties may assert and how these challenges may be brought." *Id.* (citation omitted).[8]

_____

[7] The Court notes that many of plaintiff's alleged injuries appear to have occurred as a result of his voluntary failure to comply with the Ordinance. As such, to the extent that plaintiff had notice of the Ordinance, which was in effect prior to his purchase of the rental properties at issue, plaintiff may lack standing to proceed with this challenge. *See Palmieri v. Town of Babylon*, 277 Fed. Appx. 72, 75-76 & n.2 (2d Cir. 2008) (citations omitted).

[8] Since plaintiff does not address in his brief which type of challenge he is bringing here,

(continued...)

The Court will begin with the analysis of the "'as applied' challenge because 'the permissibility of a facial challenge sometimes depends upon whether the challenged regulation was constitutional as applied.'" *Id.* (quotation omitted). In fact, the Supreme Court has instructed the courts are to "'examine the complainant's conduct before analyzing other hypothetical applications of the law.'" *Id.* (quoting *Hoffman Estates*, 455 U.S. at 495, 102 S. Ct. 1186).

In the present matter, plaintiff argues that the Ordinance is unconstitutionally vague because "[t]he code enforcer has complete discretion to decide whether [he] is in violation of the Ordinance" and because of at least eight phrases that set forth vague standards that he is required to comply with. *See* Dkt. No. 38-1. For example, section 210-8(A)(3)(1) of the Ordinance uses the phrase "clean and sanitary," which plaintiff claims was declared unconstitutionally vague in *Reha v. State of Minnesota*, 474 N.W.2d 360 (Minn. 1991). *See id.* Further, plaintiff claims that code enforcement officers have interpreted the Ordinance differently when applying its terms to others. *See id.* Plaintiff claims that these differing applications and interpretations support a finding that the Ordinance is unconstitutionally vague. *See id.* (citing *Konikov v. Orange County*, 410 F.3d 1317, 1330-31 (11th Cir. 2005); *County of Sacramento v. Lewis*, 523 U.S. 833 (1998)).

In *Raab Family Partnership v. Borough of Magnolia*, Civil No. 08-5050, 2009 WL 361135 (D.N.J. Feb. 13, 2009), the plaintiff challenged, among other things, a city ordinance that required landlords to obtain a certificate of occupancy, each year, for each apartment rented. *See id.* at *2. The plaintiff argued that the ordinance was unconstitutionally vague because "the ordinance makes the determination as to whether a particular building conforms to the Code's

---

[8](...continued)
the Court will assumed that he is attempting to assert both a facial and an as-applied challenge to the Ordinance.

provisions subject to 'the discretion of the Building Inspector or Housing Inspector[.]" *Id.* at *14. Denying the plaintiff's challenge to the ordinance, both on its face and as applied, the court noted that,

> [n]otwithstanding Plaintiffs' dissatisfaction with the "discretion" section 112-2 invests in "the Building Inspector or Housing Inspector," . . . the ordinance at issue herein manifestly is not standardless and is demonstrably not "impermissibly vague in all of its applications." *Hotel & Motel Ass'n*, 344 F.3d at 972 (citation omitted). To the contrary, section 112-2 states that whether or not a certificate of occupancy should issue is determined based upon whether the building in question meets the "standards established in the BOCA National Property Maintenance Code, 1993, Fourth edition." . . . The BOCA Code, a document "designed for adoption by state or local governments" for "the protection of public health, safety and welfare," . . . , consists almost exclusively of specific prescriptions for occupancy standards, ranging from "light, ventilation and occupancy limitations," to "mechanical and electrical requirements," to "fire safety requirements." . . . Plaintiffs' suggestion that the ordinance, which derives its standards from this detailed and highly specific professional code, is "impermissibly vague in all of its applications," is untenable. *Hotel & Motel Ass'n*, 344 F.3d at 972 (citation omitted).

*Id.* at *13 (internal citations omitted). Moreover, the court held that the fact that the ordinance makes the determination as to whether a particular building conforms to the Code's provisions subject to the building inspector's "discretion" does not "transform these specific prescriptions into a standardless and impermissibly vague enactment vulnerable to Plaintiffs' vagueness challenge. *Id.* at *14.

As in *Raab Family Partnership*, the Court finds that the challenged provisions are "crafted with sufficient clarity to give the person of ordinary intelligence a reasonable opportunity to know what is prohibited." *Thibodeau*, 486 F.3d at 65 (citations omitted). The Code sets forth fifteen different categories of standards that each rental unit must be in compliance with and provides detail regarding what each rental unit must do to be in compliance. *See* Dkt. No. 38-1 at 50-52.

These categories include standards for light and ventilation, access and vertical travel, exits, structural requirements, exterior protection, interior protection, plumbing, heating equipment, electrical, cooking and refrigeration equipment, fire protection, maintenance requirements, registration of rental unit, exterior property areas, and prohibited storage. *See id.* Moreover, Chapter 210 of the Code, which is at issue in this case, provides that its purpose is to ensure that all "residential rental property is maintained in accordance with the standards set forth in this chapter and the building and property maintenance codes promulgated by New York State Department of State." *See id.* at 44. The Court fails to see how the Code is unclear as to what is required of residential rental units in order to obtain a rental certificate.

Moreover, to the extent that plaintiff is claiming that the Ordinance is unconstitutionally vague because it "fails to provide sufficiently explicit standards for those who apply it," and "impermissibly delegates basic policy matters . . . for resolution on an ad hoc and subjective basis," *Farid*, 593 F.3d at 243, his argument is without merit. Specifically, plaintiff claims that the following phrases are unconstitutionally vague: (a) "grade level," (b) "substantially free of cracks," (c) "approved source," (d) "approved chimneys," (e) "suitable means," (f) "properly rated," (g) "all other conditions," and (h) "clean and sanitary." *See* Dkt. No. 38-1 at 4. When looking at these phrases out of their context, an argument could be made that they are overly vague and discretionary. However, when viewed in the context of the section from which they are taken, they provide sufficiently explicit standards for those who are applying them. *See Farid*, 593 F.3d at 243. For example, section 210-8(A)(3)(c) provides that "[a]ll exits from rental units shall provide safe, continuous and unobstructed means of exit from the interior of the building to the exterior at **grade level.**" *See* Dkt. No. 38-1 at 50 (emphasis added). "Grade level" is a term that is commonly used in municipal building codes and is simply another way of stating

"ground level." *See Wright v. Board of Educ. of City of Chicago* 781 N.E.2d 386, 390 (Ill. App. 1st Dist. 2002); *Swallow v. City of Lewiston*, 534 A.2d 975, 977 (Me. 1987); *Congregation Gates of Prayer v. Board of Appeals, Vill. of Lawrence*, 48 A.D.2d 679, 681 (2d Dep't 1975) (providing that the New York State Construction Code requires three exists from an assembly hall "and further mandates that such exits must provide a safe continuous passage from the interior of the structure to the street or other legal open spaces at **grade level** connected with the street" (emphasis added)).

Further, the expression "clean and sanitary" has been upheld by numerous courts as not being unconstitutionally vague, with the courts specifically finding that the phrase does not provide too much discretion to the enforcing officials. *See, e.g., Scope Pictures, of Missouri, Inc. v. City of Kansas City*, 140 F.3d 1201, 1205-06 (8th Cir. 1998); *In re Conservatorship of Gregory*, 95 Cal. Rptr. 2d 336, 342-43 (Cal. App. 3d Dist. 2000); *Aloha, Inc. v. Liquor Control Com'n*, 548 N.E.2d 116, 119 (Ill. App. 4th Dist. 1989). Moreover, the sole case to which plaintiff cites in support of his argument that the phrase "clean and sanitary" is unconstitutionally vague was overturned on appeal to the Supreme Court of Minnesota. *See State, City of Minneapolis v. Reha*, 483 N.W.2d 688, 689 (Minn. 1992) (reversing *State v. Reha*, 474 N.W.2d 360 (1991) and holding that the phrase "clean and sanitary" is not unconstitutionally vague).

The remaining allegedly vague phrases, when read in context, are sufficiently precise to allow persons of ordinary intelligence to understand what is expected of them and do not provide defendant Schenectady's enforcing officials with the ability to enforce the Code on an entirely "subjective and ad hoc" basis. In fact, the Code provides that if a rental certificate is denied because of existing violations of the Code, the applicant will be provided with a "written notice which specifies the alleged violations and which advises the owner of his/her right to a hearing

before the Building Inspector." *See* Dkt. No. 38-1 at 52. As such, the Code provides a method of review to help ensure that the Code Enforcement Officers are not applying its provisions in an arbitrary manner.[9]

Further, the fact that the Ordinance makes the determination as to whether a particular building conforms to the Code's provisions, subject to the "discretion" of the Building Inspector or his representative, does not transform these specific prescriptions into a standardless and impermissibly vague enactment that is vulnerable to plaintiff's vagueness challenge. The use of the word "discretion" does not alone render it unconstitutionally vague because "[t]he issuance of a certificate of occupancy 'necessarily involves the governmental decision making process and requires an[ ] exercise of discretion.'" *Collins v. Olin Corp.*, 418 F. Supp. 2d 34, 62 (D. Conn. 2006) (quotation and other citations omitted).

Based on the foregoing, the Court finds that plaintiff has failed to carry his burden of persuasion that he is likely to succeed on the merits of his claim that the Ordinance is unconstitutionally vague, either as applied to him or on its face.[10]

---

[9] The Court notes that the record does not provide whether plaintiff ever attempted to avail himself of this opportunity for a hearing before the Building Inspector to review the decision of the Code Enforcement Officer.

[10] The Court notes that the law in the Second Circuit is unclear "[w]hether a facial void-for-vagueness challenge can be maintained when, as here, a challenge is *not* . . . based on the First Amendment[.]" *Dickerson v. Napolitano*, 604 F.3d 732, 743 (2d Cir. 2010) (footnote and citations omitted). As the Second Circuit has noted, however, there are two possible standards which may govern such a challenge.

"The first possible standard for evaluating facial challenges outside of the First Amendment context is that such challenges are permitted only when 'no set of circumstances exists under which the [law] would be valid.'" *Id.* (quoting *United States v. Salerno*, 481 U.S. 739, 745, 107 S. Ct. 2095, 95 L. Ed. 2d 697 (1987)) (other citation omitted). Under this standard, if the party's as-applied challenge to the law has failed, so too must the facial challenge. *See id.* at 743-44 (citations omitted).

(continued...)

17

### 2. Fourth Amendment challenge

Plaintiff asserts that "[t]he ordinance violates [his] Fourth Amendment rights as it imposes unconstitutional condition requiring a warrantless inspection for any of [his] rental units before issuing a certificate for that unit." *See* Dkt. No. 38-1 at 17. Moreover, plaintiff claims that "[t]his requirement is being enforced with threats of criminal prosecutions, arrest warrants, incarceration, apartment vacating orders and huge fines that have caused and continue to cause fear and intimidation upon [him] as a landlord." *See id.*

The Fourth Amendment protects individuals in their homes "against unreasonable searches and seizures." U.S. Const. amend. IV. "A warrantless search is 'per se unreasonable . . . subject to only a few specifically established and well-delineated exceptions.'" *United States v. Elliott*, 50 F.3d 180, 185 (2d Cir. 1996) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973)). "'A warrantless inspection of a private dwelling by a municipal administrative officer without the consent of the owner is generally unreasonable absent specifically delineated circumstances. . . . However, searches pursuant to a regulatory scheme need not adhere to the usual requirements where special governmental needs are present.'" *Mangino v. Incorporated Vill. of Patchogue*, 739 F. Supp. 2d 205, 238 (E.D.N.Y. 2010) (quotation and other citation omitted).

---

[10](...continued)
The second potential standard allows for a non-first amendment facial challenge, but only when a constitutionally protected right is implicated. *See id.* at 744 (citation omitted). The Second Circuit has interpreted this standard "to permit a non-First Amendment vagueness challenge only after concluding that 'the law is "permeated" with vagueness, and, perhaps, that it infringes on a constitutional right and has no *mens rea* requirement.'" *Id.* (quotations and other citation omitted).

As the above discussion makes clear, under either standard, plaintiff has not established that he is likely to succeed on the merits of this claim.

In *Sokolov v. Freeport*, 52 N.Y.2d 341 (1981), the plaintiff brought a Fourth Amendment challenge to a Village of Freeport ordinance which mandated that residential rental property within the village could not be let or re-let without first obtaining a permit from the village. *See id.* at 343. According to the ordinance, upon notification of vacancy by an owner, the department of buildings "must conduct an inspection of the property within two business days." *Id.* at 344. The ordinance further provided for a fine if a landlord refused to consent to a warrantless search. *See id.* The plaintiff was prosecuted in criminal actions and claimed that the ordinance was violative of his Fourth Amendment rights. *See id.* at 345. In finding that the ordinance violated the Fourth Amendment, the New York Court of Appeals held that the ordinance effectively authorized and required warrantless inspection of residential rental property. *See id.* at 347 (holding that "[a]n ordinance which compels consent to a warrantless search may not be upheld except in certain carefully limited circumstances"). Moreover, noting that the standard for obtaining a search warrant for an administrative search is significantly less strict than in the criminal context, the court held that

> [w]e do not believe, however, that the requirement of a warrant for an administrative inspection is a hollow one. It has been postulated that, among other things, the warrant requirement may present inspections based upon caprice or spite and prevent administrative inspections as a pretext for police investigations; and the use of a warrant may also lead to appropriate restrictions on the place to be searched. . . . The minor and infrequent inconvenience which a warrant requirement may create cannot overshadow the substantial benefits which will result to the individual's dignity and liberty through the preservation of his right to privacy. It must also be emphasized, however, that our holding is not to be construed as preventing prompt inspections in true emergency situations[.]

*Id.* at 348-49 (internal footnote and citations omitted).

On the same day that the New York Court of Appeals decided *Sokolov*, it also issued a decision in *Pashcow v. Town of Babylon*, 53 N.Y.2d 687 (1981), which dealt with a similar

municipal code.  In *Pashcow*, the court held that "[i]n this action for a declaratory judgment it cannot be said that the ordinance of the Town of Babylon is unconstitutional on its face, for it does require consent or a warrant for an administrative search except in emergency situations." *Id.* at 688.  The court refused to speculate as to whether the statute could be applied in an unconstitutional manner, but noted that "an owner's ability to rent his premises may not be conditioned upon his consent to a warrantless inspection." *Id.* (citation omitted).[11]

More recently, in *Palmieri v. Town of Babylon*, No. 01 CV 1399, 02 CV 6075, 2006 WL 1155162 (E.D.N.Y. Jan. 6, 2006), *aff'd*, 277 Fed. Appx. 72 (2008), the plaintiff challenged a rental permit law that required property owners to obtain a rental permit for any non-owner occupied rental unit regardless of whether or not rent is paid.  *See id.* at *1.  The ordinance allowed the building inspector to inspect a premises when a landlord applies for a rental permit, but, if the landlord refuses to consent to the inspection, the building inspector was required to apply to the district court for a search warrant "where there is reasonable cause to believe that a violation" of the law has occurred.  *Id.* at *10 & n.8.  The plaintiff had never applied for or obtained a rental permit for his property and, therefore, defendant commenced criminal proceedings against him.  *See id.* at *1.

Rejecting the plaintiff's Fourth Amendment claim, which alleged that the ordinance was unconstitutional on its face and as applied to him, the court first held that because a warrant obtained on "reasonable cause" is the equivalent of "probable cause" under the Fourth Amendment, this argument must fail.  *See id.* at *10 (citations omitted).  Next, citing to *Pashcow*, the court rejected the plaintiff's Fourth Amendment facial challenge.  *See id.* (citation omitted).

---

[11] Notably, unlike the municipal ordinance at issue in *Sokolov*, the ordinance at issue in *Pashcow* did not subject a landlord to a fine or criminal prosecution if he refused to consent to a warrantless inspection.

Finally, the court rejected plaintiff's as applied challenge, in which he alleged that he was unconstitutionally seized by the defendant through its use of the rental permit law.  *See id.* at \*10-\*11.

Similarly, in *Arrowsmith v. City of Rochester*, 309 A.D.2d 1201 (4th Dep't 2003), the ordinance at issue required landlords to apply for renewal of certificates of occupancy for their residential rental properties every five years.  *See id.* at 1201.  First, the Fourth Department held that the ordinance is "'sufficiently precise to satisfy the requirements of due process.'" *Id.* (quotation omitted).  The court then noted that the ordinance does not authorize warrantless, nonconsensual inspections of the rental properties.  *See id.* (citations omitted).  Finally, the court held that "[t]he requirement that plaintiffs apply for renewal of certificates of occupancy every five years bears a reasonable relationship to defendant's legitimate goals of promoting public health and safety and maintaining property values . . . , and defendant's decision not to impose the same requirement on owner-occupied residential property has a rational basis[.]" *Id.* (internal citations omitted); *see also Brockport Sweden Property Owners Assoc. v. Village of Brockport*, 81 A.D.3d 1416 (4th Dep't 2011); *McLean v. City of Kingston*, 57 A.D.3d 1269 (3d Dep't 2008); *Stender v. City of Albany*, 188 A.D.2d 986 (3d Dep't 1992).

Contrary to plaintiff's assertions, the Ordinance at issue does not subject him to warrantless inspections before he may be issued a rental certificate for his rental units.  As in *Pashcow* and *Palmieri*, if the owner of a rental unit refuses to allow defendant Schenectady's code enforcement officers to conduct an inspection so that it may issue a rental certificate, the code enforcement officer must then apply to the City Court for a search warrant for that premises.  *See Palmieri*, 2006 WL 1155162, at \*10-\*11; *Pashcow*, 53 N.Y.2d at 688.  Moreover, the Ordinance does not make it unlawful to refuse consent for a search of a rental unit; it simply makes it

unlawful to rent an apartment without first obtaining a rental certificate.  Refusing consent for a warrantless inspection of the rental unit simply requires the code enforcement officer to obtain a search warrant, which may cause additional delay in the process of obtaining a rental certificate. Finally, to extent that plaintiff is attempting to assert that the Ordinance violates his Fourth Amendment rights regarding apartments which are occupied, he does not have standing to bring such a challenge.  *See Mangino*, 739 F. Supp. 2d at 234 (citing cases).

Based on the foregoing, the Court finds that plaintiff has not established that he is likely to succeed on the merits of his Fourth Amendment claims.

### 3. First amendment retaliation

Plaintiff asserts that "because [he is] a newcomer to Schenectady, filed tax grievances fighting the arbitrary assessments of my properties, complained of selective code enforcement to elected officials and filed this lawsuit, code enforcement officers have used the Ordinance to retaliate against me for exercising [his] First Amendment rights."  *See* Dkt. No. 38-1 at 14-15. Plaintiff claims that he was notified in July of 2009 that he won a tax grievance and that defendants Viscariello and Wickham entered his property on October 1, 2009 and issued him two court appearance tickets requiring him to obtain electrical and plumbing permits.  *See id.* at 15. Thereafter, additional charges of working without a building permit, a zoning violation, and a charge of violating the rental certificate ordinance were added.  *See id.*  Moreover, plaintiff claims that he "received the latest three Ordinance violation notices dated June 13, 2011, after [he] wrote to Magistrate Judge David Homer on June 2, 2011 requesting code enforcement documents related to the court appearance tickets which were issued by defendants Viscariello and Wickham demanding from other property owners that they obtain electrical, plumbing and building permits

similar to their ticket demands from [him] in order to support [his] retaliation and equal protection claims." *See id.* at 16. Finally, plaintiff claims that defendants' conduct has caused him to not file property tax grievances in May of 2010 or in May of 2011. *See id.* at 19-20.

"[T]he Second Circuit has 'described the elements of a First Amendment retaliation claim in several ways, depending on the factual context.'" *Sloup v. Loeffler*, No. 05-CV-1766, 2008 WL 3978208, *22 (E.D.N.Y. Aug. 21, 2008) (quoting *Williams v. Town of Greenburgh*, [535 F.3d 71, 76 (2d Cir. 2008)]). Where a private citizen asserts a First Amendment claim against a public official, the plaintiff must demonstrate that (1) the plaintiff engaged in speech or conduct that the First Amendment protects; (2) the plaintiff's exercise of his First Amendment rights motivated the defendant's actions; and (3) the defendant's actions effectively chilled the plaintiff's exercise of those rights. *See Williams v. Town of Greenburgh*, 535 F.3d 71, 76 (2d Cir. 2008) (citing *Curley v. Village of Suffern*, 268 F.3d 65, 73 (2d Cir. 2001)); *Moran v. City of New Rochelle*, 346 F. Supp. 2d 507, 517 (S.D.N.Y. 2004) (citation omitted).

In cases "involving criticism of public officials by private citizens," the Second Circuit has generally "impose[d] an actual chill requirement for First Amendment retaliation claims[,]" *i.e.*, a requirement that the plaintiff allege and ultimately prove an "actual chill" of his First Amendment rights. *Gill v. Pidlypchak*, 389 F.3d 379, 381 (2d Cir. 2004) (citing *Spear v. Town of West Hartford*, 954 F.2d 63, 68 (2d Cir. 1992)); *see also Curley v. Vill. of Suffern*, 268 F.3d 65, 73 (2d Cir. 2001) (holding that the "plaintiff must show, with respect to the third element, that his First Amendment rights were 'actually chilled'"). To establish this element, it is not enough for the plaintiff simply to show that he changed his behavior in some way; he must show that the defendant intended to, and did, prevent or deter him from exercising his rights under the First Amendment. *See, e.g., Greenwich Citizens Comm., Inc. v. Counties of Warren & Washington*

*Indus. Dev. Agency*, 77 F.3d 26, 31 (2d Cir. 1996) (holding that, to establish a First Amendment retaliation claim, the plaintiffs must show that the defendants acted "with the purpose of deterring the exercise of First Amendment freedoms"); *Wolff v. Town of Mount Pleasant*, No. 06 Civ. 3864, 2009 WL 1468691, *6 (S.D.N.Y. Apr. 27, 2009) (holding that, "[i]n order to maintain a First Amendment retaliation claim, a private citizen complainant must allege that the defendant took some action in response to his or her First Amendment activity that 'effectively chilled the exercise of his First Amendment right'" (quoting *Williams*, 535 F.3d at 76)); *Spear v. Town of W. Hartford*, 954 F.2d 63, 67 (2d Cir. 1992) (holding that "Spear's naked assertion of a chill does not suffice to defeat a Rule 12(b)(6) motion"); *see also Colombo v. O'Connell*, 310 F.3d 115, 117 (2d Cir. 2002) (affirming summary judgment for the defendant on the plaintiff's First Amendment claim and indicating that the plaintiff had failed to even state a valid claim because she had "alleged no actual affect on the exercise of her First Amendment rights at all").

However, "where the retaliation is alleged to have caused an injury separate from any chilling effect, such as a job loss or demotion, an allegation as to a chilling effect is not necessary to state a claim." *Puckett v. City of Glen Cove*, 631 F. Supp. 2d 226, 239 (E.D.N.Y. 2009) (citing *Morrison v. Johnson*, 429 F.3d 48, 51 (2d Cir. 2005)) (other citation omitted). As the Second Circuit has noted,

> defendants are correct that a plaintiff asserting First Amendment retaliation must allege some sort of harm, but they are wrong that this harm must, in all cases, be a chilling of speech. In the employment context, under this framework, the harm is some concrete diminution in job responsibilities, security, or pay – up to and including termination. In the prison context, the harm could include such an adverse action as placing a plaintiff in keeplock for a period of weeks. Indeed, even in certain cases involving public official/private citizen retaliation claims, we have seemingly not imposed a subjective chill requirement where some other harm is asserted. For example, in *Gagliardi v. Village of Pawling*, 18 F.3d 188 (2d Cir. 1994), we confronted the plaintiffs' claim that the

24

municipal defendants' alleged misapplication of the zoning code was conducted in retaliation for the plaintiffs' exercise of their free speech rights. To establish a retaliation claim under 42 U.S.C. § 1983 under those circumstances, we held that the plaintiffs must initially show (1) "that [their] conduct was protected by the first amendment," and (2) that "defendants' conduct was motivated by or substantially caused by [plaintiffs'] exercise of free speech." *Id.* at 194 (quoting *Brady v. Town of Colchester*, 863 F.2d 205, 217 (2d Cir. 1988)), and nothing beyond the two requirements. Still, the *Gagliardi* plaintiffs' retaliation claim apparently survived a motion to dismiss because (1) they made an adequate showing on both of these accounts, but also because (2) they adequately pleaded non-speech injuries – among other things, noise pollution. *Id.* at 190. *See also Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals*, 282 F.3d 83 (2d Cir. 2002) (applying same test in similar context).

*Gill*, 389 F.3d at 383.

In the present matter, plaintiff has adequately demonstrated that he engaged in conduct protected by the First Amendment. Plaintiff alleged that he successfully challenged defendant Schenectady's tax assessment for several of his properties in 2009 and that he repeatedly complained to the City's officials about the selective enforcement of its ordinances. Such conduct is clearly protected by the First Amendment. *See Dougherty*, 282 F.3d at 91 (holding that "[t]he rights to complain to public officials and to seek administrative and judicial relief from their actions are protected by the First Amendment" (collecting cases)); *Franco v. Kelly*, 854 F.2d 584, 589 (2d Cir. 1988) (same).

Regarding the second element, the Court finds that plaintiff has failed to demonstrate that defendants' conduct was motivated by plaintiff's exercise of his First Amendment rights. Plaintiff asserts that defendants' actions in enforcing the City Building Code was in retaliation for filing and winning tax grievances. *See* Dkt. No. 38-1 at 9. Plaintiff, however, won this grievance in July of 2009, but was not issued an appearance ticket requiring plumbing and electrical permits until three (3) months later in October of 2009. *See id.* at 5. Moreover, plaintiff equates a

25

complaint to defendant Stratton on February 24, 2010 to a notice of violation for failure to obtain a rental certificate on April 27, 2010. *See id.* at 6. These alleged retaliatory actions are too attenuated to establish that defendants' conduct was motivated by plaintiff's exercise of First Amendment rights.

The Court recognizes that it is well settled that proof of causation may be shown indirectly by, among other things, demonstrating that the protected activity was followed closely by a retaliatory action. *See Cifra v. Gen. Elec. Co.*, 252 F.3d 205, 217 (2d Cir. 2001) (holding that "[t]he causal connection needed for proof of a retaliation claim 'can be established indirectly by showing that the protected activity was closely followed in time by the adverse action'" (quoting *Reed v. A.W. Lawrence & Co.*, 95 F.3d 1170, 1178 (2d Cir. 1996)) (other citation omitted); *see also Gordon v. N.Y. City Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000). Of course, the Court recognizes that the Second Circuit "has not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action." *Gorman–Bakos v. Cornell Coop. Extension of Schenectady Cnty.*, 252 F.3d 545, 554 (2d Cir. 2001). Moreover, the relevance of temporal proximity in a particular First Amendment retaliation case turns on its unique facts and circumstances. *See Smith v. Da Ros*, No. 09 Civ. 458(MRK), 2011 WL 839374, *13 (D. Conn. Feb. 25, 2011) (citing *Burkybile v. Bd. of Educ. of Hastings–On–Hudson Union Free Sch. Dist.*, 411 F.3d 306, 314 (2d Cir. 2005)).

In the present matter, the Court finds that the alleged temporal proximity of the protected speech and the alleged retaliation are insufficient to carry plaintiff's of persuasion of establishing that defendants' conduct was motivated by his speech. Although a period of only two months may be sufficient in certain circumstances, *see Ashok v. Barnhart*, 289 F. Supp. 2d 305, 315

26

(E.D.N.Y. 2003), plaintiff provides no other factual support indicating that plaintiff's speech motivated defendants' alleged retaliatory conduct. *Cf. Frisenda v. Incorporated Village of Malverne*, ___ F. Supp. 2d ___, 2011 WL 1227774, *19 (E.D.N.Y. 2011) (holding that "courts in this Circuit have consistently held that a passage of more than two months between the protected activity and the adverse employment action does not allow for an inference of causation" (citing cases)). As such, the Court finds that it has not been established that defendants' conduct was motivated by plaintiff's First Amendment protected activities.

Moreover, although plaintiff alleges that the June 13, 2011 notices of violation were filed in retaliation for a letter request plaintiff submitted to Magistrate Judge Homer on June 2, 2011 and Magistrate Judge Homer's Order granting his request, Mr. Paniccia's affidavit clearly provides that he was not aware of the pending litigation and that the notices of violation were unrelated to the present litigation. *See* Dkt. No. 42-7 at ¶¶ 20-22.

Finally, the Court finds that plaintiff has not demonstrated that defendants intended to, and did, prevent or deter him from exercising his rights under the First Amendment. *See, e.g., Greenwich Citizens Comm., Inc.*, 77 F.3d at 31. Although plaintiff alleges that defendants' conduct prevented him from filing tax grievances in 2010 and 2011, plaintiff continued to lodge complaints about City officials regarding their behavior and their failure to issue him rental certificates for his rental units. *See* Dkt. No. 38-1 at 18. Moreover, defendants' conduct has clearly not deterred plaintiff from vigorously prosecuting the present action. As such, the Court finds that plaintiff has failed to show that his speech was actually chilled by defendants' conduct. *See Rosendale v. Brusie*, No. 07-CV-8149, 2009 WL 778418, *11 (S.D.N.Y. Mar. 25, 2009) (citing cases).

Based on the foregoing, the Court finds that plaintiff has not carried his burden of persuasion that he is likely to succeed on his First Amendment retaliation claims.

### 4. Equal protection claim

The Equal Protection Clause requires the government to treat all similarly situated people alike. *See Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001) (citing *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439, 105 S. Ct. 3249, 87 L. Ed. 2d 313 (1985)). A plaintiff may proceed under the Equal Protection Clause as either a "class of one," *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (*per curiam*) (citations omitted), or under the theory of "selective enforcement," *Diesel v. Town of Lewisboro*, 232 F.3d 92, 103 (2d Cir. 2000) (citation omitted).[12]

### a. Selective Enforcement

The Second Circuit has "described selective enforcement as a 'murky corner of equal protection law in which there are surprisingly few cases.'" *Diesel*, 232 F.3d at 103 (quoting *LeClair v. Saunders*, 627 F.2d 606, 608 (2d Cir. 1980)).  Nevertheless, it is well settled that a plaintiff must meet a two-pronged test in order to successfully demonstrate selective enforcement under the Fourteenth Amendment.  *See Cine SK8, Inc. v. Town of Henrietta*, 507 F.3d 778, 790 (2d Cir. 2007) (quotation omitted).

"[T]o succeed on a 'selective enforcement claim,' a plaintiff must show: '(1) that they were treated differently from other similarly situated individuals, and (2) that such differential

---

[12] In light of plaintiff's *pro se* status, the Court has treated plaintiff's complaint as alleging both a class of one and a selective enforcement claim.

treatment was based on impermissible considerations such as race, religion, intent to inhibit or

punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.'"

*Sebold v. City of Middletown*, No. 3:05-CV-1205, 2007 WL 2782527, *26 (D. Conn. Sept. 21,

2007) (quotation omitted); *see also Cine SK8*, 507 F.3d at 790 (quotation omitted); *Church of the*

*Am. Knights of the Ku Klux Klan v. Kerik*, 356 F.3d 197, 210 (2d Cir. 2004) (holding that "[a]

selective enforcement claim requires, as a threshold matter, a showing that the plaintiff was

treated differently compared to others similarly situated").

      In particular, a "plaintiff must present evidence comparing [him]self to individuals that are

'similarly situated in all material respects.'" *Sebold v. City of Middletown*, No. 3:05-CV-1205,

2007 WL 2782527, *26 (D. Conn. Sept. 21, 2007) (quoting *Graham v. Long Island R.R.*, 230

F.3d 34, 39 (2d Cir. 2000)).  Further, the Second Circuit has held that, to the extent a municipality

is selectively enforcing land use restrictions, a plaintiff would be "hard-pressed" to demonstrate

selective treatment without also demonstrating the municipality's knowledge of the other,

unenforced violations.  *See LaTrieste Rest. v. Vill. of Port Chester*, 188 F.3d 65, 69 (2d Cir. 1999)

(citations omitted).  However, the Second Circuit also stated that

> [w]e do not hold that knowledge will be required in every case.  It
> is conceivable that selective treatment could be shown where, for
> example, proof was offered that a municipality did not know of
> prior violations because it adhered to a see-no-evil policy of not
> enforcing an ordinance, and then abandoned that policy with respect
> to a violator engaged in protected activity.

*Id.* at 70 n.1.

      In the present matter, plaintiff claims that defendants are "menacing toward newcomers to

Schenectady" and that "they wrote me violations of the Ordinance on October 1st, 2009; January

15, 2010; February 19, 2010 and April 27, 2010 for renting apartments without rental certificates

in three of my properties, after I complained of selective code enforcement of city codes, met with

city officials on November 10th, 2009 and again raised the selective enforcement of city codes issue, and after I wrote complaints to Mayor Brian Stratton on February 24, 2010 and to City Council President Gary McCarthy on March 8th, 2010." *See* Dkt. No. 38-1 at 16. These bare and conclusory allegations of past alleged instances of retaliatory conduct are insufficient to meet plaintiff's burden. Moreover, plaintiff alleges that rental certificates were issued to a different landlord for three different apartments in the building at 1151-59 Crane Street without requiring an inspection of the basement, but that he was denied rental certificates for apartments in the same building by a different code enforcement officer on the same day because the basement was not inspected. *See id.* at 14. First, plaintiff's unsupported allegation that the other code enforcement officer issued the rental certificates without inspecting the basement does not meet plaintiff's burden of establishing that he was treated differently from an individual who is similar in all material respects. The Court has no way of knowing whether or not the basement was actually inspected. Finally, plaintiff fails to establish that defendants knowingly enforced the Ordinance against him but failed to issue violations for other landlords who have failed to obtain a rental certificate in compliance with the Ordinance. *See LaTrieste Rest.*, 188 F.3d at 69 (citation omitted).

In any event, as discussed above, plaintiff has failed to establish that any such differences in treatment was done with the intent to inhibit or punish plaintiff for his protected activities. Although the theory of equal protection on which plaintiff relies is unclear, the facts he cites are essentially the same as those underlying his First Amendment retaliation claim. Therefore, plaintiff's equal protection claim is grounded on his contention that he was treated differently because he had exercised his First Amendment rights. Since his equal protection claim is dependent on his First Amendment retaliation claim, the two claims coalesce. *See African Trade*

& *Info. Ctr., Inc. v. Abromaitis*, 294 F.3d 355, 363 (2d Cir. 2002) (holding that the plaintiffs' First Amendment and equal protection claims coalesced because the alleged deprivation of equal protection was "punish[ment]" for plaintiffs' exercise of their First Amendment rights); *Gentile v. Nulty*, 769, F. Supp. 2d 573, 582-83 (S.D.N.Y. 2011) (holding that claims coalesced because the plaintiff alleged his unequal treatment was retaliation for his prior lawsuits against the same municipal defendant) (quotation and other citation omitted).  "'Where this is the case, the equal protection claim is dependent on the First Amendment claim; in other words where the First Amendment claim has failed, the equal protection claim fails, too.'"  *Gentile*, 769 F. Supp. 2d at 582-83 (quoting *Kempkes v. Downey*, No. 07 Civ. 1298(KMK), 2008 WL 852765, *6 (S.D.N.Y. Mar. 31, 2008) (other citations omitted); *see also Cobb v. Pozzi*, 363 F.3d 89, 110 (2d Cir. 2004) (quotation omitted).

Based on the foregoing, the Court finds that plaintiff has not carried his burden of persuasion that he is likely to succeed on his selective enforcement equal protection claim.

### b. Class of one

Defendants assert that plaintiff cannot rely on a "class of one" theory because, among other things, plaintiff failed to "identify a non-discretionary governmental action[.]" *See* Dkt. No. 42-13 at 16.  Further, defendants claim that plaintiff cannot "demonstrate substantial or prima facie similarity due to a number of factors[,]" including "complaints from tenants for the various properties and the fact that some owners were resident and others were non-resident landlords." *See id.* (citing *Tarantino v. City of Hornell*, 615 F. Supp. 2d 102, 114 (W.D.N.Y. 2009)).[13]

---

[13] The Court notes that *Tarantino v. City of Hornell*, 615 F. Supp. 2d 102 (W.D.N.Y. 2009) was abrogated by *Analytical Diagnostic Labs, Inc. v. Kusel*, 626 F.3d 135 (2d Cir. 2010).

To prevail on a "class of one" equal protection theory, a plaintiff must show that the defendant "intentionally treated [him] differently from others similarly situated and that there is no rational basis for the difference in treatment." *Neilson v. D'Angelis*, 409 F.3d 100, 104 (2d Cir. 2005), *overruled on other grounds*, *Appel v. Spiridon*, 531 F.3d 138 (2d Cir. 2008) (quoting *Village of Willowbrook v. Olech*, 528 U.S. 562, 564, 120 S. Ct. 1073, 145 L. Ed. 2d 1060 (2000)).[14]  The plaintiff's burden on a "class of one" claim is "extremely high," and a plaintiff cannot prevail absent a *prima facie* showing that he is "identical in all relevant respects" to the individuals with whom he compares himself.  *Id.* (citation omitted).  Specifically, the plaintiff must establish that

> "(i) no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy; and (ii) the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendants acted on the basis of a mistake."

*Analytical Diagnostic Labs, Inc. v. Kusel*, 626 F.3d 135, 140 (2d Cir. 2010) (quotation and footnote omitted).[15]

---

[14] The Court notes that *Neilson* involved the application of the class-of-one equal protection theory in the public employment context.  Subsequent to the decision in *Neilson*, however, the Supreme Court explicitly held that "the class-of-one theory of equal protection does not apply in the public employment context."  *Engquist v. Or. Dep't of Agric.*, 553 U.S. 591, 595 (2008).  Thus, the Second Circuit "overrule[d] [*Neilson*] . . . to the extent that it conflicts with the holding of *Engquist*."  *Appel v. Spiridon*, 531 F.3d 138, 139-40 (2d Cir. 2008).  Nevertheless, the Second Circuit's discussion in *Neilson* regarding the level of similarity necessary to support a class-of-one equal protection claim has not been overruled.  *See Smith v. Fischer*, No. 9:07-CV-1264, 2009 WL 632890, *10 n.30 (N.D.N.Y. Feb. 02, 2009) (quotation and other citations omitted).

[15] Although the Supreme Court used the words "similarly situated" to describe the standard for a "class of one" claim, it is not the same standard of "similarity" as used in a protected-class discrimination claim.  *Neilson*, 409 F.3d at 104-05.  The difference comes from the purpose of the showing.  *See id.*  In a claim of discrimination based on group status, the treatment of persons in similar circumstances is offered to "provide, along with other evidence, an evidentiary inference

(continued...)

The Supreme Court's decision in *Engquist v. Or. Dep't of Agric.*, 553 U.S. 591 (2008),

eliminated class-of-one claims for government employees. *Engquist* involved a former state

employee who sued his employer after being laid off during an agency reorganization, alleging

that she was fired for arbitrary and malicious reasons. *See id.* at 595. The Court analyzed *Olech*

and noted that, there, the plaintiff stated a valid class-of-one equal protection claim because she

had "'been intentionally treated differently from others similarly situated and that there is no

rational basis for the difference in treatment.'" *Id.* at 601 (quotation omitted). The Court

continued, however, that

> [t]here was no indication in *Olech* that the zoning board was
> exercising discretionary authority based on subjective,
> individualized determinations – at least not with regard to easement
> length, however typical such determinations may be as a general
> zoning matter. Rather, the complaint alleged that the board
> consistently required only a 15-foot easement, but subjected Olech
> to a 33-foot easement. This differential raised a concern of
> arbitrary classification, and we therefore required the State provide
> a rational basis for it.

*Id.* at 602-03 (citation omitted). Conversely, the *Engquist* Court found that some types of state

action inherently "involve discretionary decisionmaking based on a vast array of subjective,

individualized assessments." *Id.* at 603. Such state action does not violate the Equal Protection

Clause "when one person is treated differently from others, because treating like individuals

differently is an accepted consequence of the discretion granted." *Id.* The Court found that

"[t]his principle applies most clearly in the employment context, for employment decisions are

---

[15](...continued)
of the use of particular impermissible factors," whereas in a "class of one" claim, "the existence of
persons in similar circumstances who received more favorable treatment than the plaintiff is
offered to provide an inference that the plaintiff was intentionally singled out for reasons that so
lack any reasonable nexus with a legitimate governmental policy that an improper purpose –
whether personal or otherwise – is all but certain." *Id.* (citation omitted).

quite often subjective and individualized" and dismissed the plaintiff's claim. *Id.* at 604. The Court noted, however, that its holding was limited to finding "that the class-of-one theory of equal protection has no application in the public employment context – and that is all we decide[.]" *Id.* at 607.

In *Analytical Diagnostic Labs, Inc.*, the Second Circuit discussed whether *Engquist* is limited to the public employment context or whether it should extend to other types of discretionary government behavior. *See Analytical Diagnostic Labs, Inc.*, 626 F.3d at 141-42. Joining the Seventh Circuit, the Second Circuit held that "not all discretionary activity is 'off-limits from class-of-one claims.'" *Id.* at 142 (quotation omitted). Quoting *Engquist*, the court held that there was a "'crucial difference, with respect to constitutional analysis, between the government exercising the power to regulate or license, as lawmaker, and the government acting as proprietor, to manage its internal operations.'" *Id.* (quoting *Engquist*, 553 U.S. at 598, 128 S. Ct. 2146). Moreover, the court noted that the "'government has significantly greater leeway in its dealings with citizen employees than it does when it brings its sovereign power to bear on citizens at large.'" *Id.* (quotation omitted). As such, the court held that, because the department of health did "not possess unfettered discretion in deciding whether to revoke, suspend or otherwise limit an existing license[,]" the plaintiffs had a way to distinguish themselves from other labs whom the department of health allegedly subjected to less scrutiny. *Id.* (citation omitted); *see also Hanes v. Zurick*, 578 F.3d 491, 496 (7th Cir. 2009) (noting that "the officer who repeatedly arrests someone solely because of malice does have a way to distinguish between the citizen repeatedly arrested and the citizen left alone: the officer hates the arrestee").

Contrary to defendants' assertions, plaintiff's class-of-one equal protection claim is not barred simply because defendants' decision to enforce the Ordinance against him involved

34

discretionary action.  *See Analytical Diagnostic Labs, Inc.*, 626 F.3d at 142. (holding that "[w]e

join the Seventh Circuit in holding that *Engquist* does not bar all class-of-one claims involving

discretionary state action").  Despite this, however, plaintiff has still failed to meet his burden that

his circumstances were sufficiently similar to any of the unnamed comparators so that "'no

rational person could regard the circumstances of the plaintiff to differ from those of a comparator

to a degree that would justify the differential treatment on the basis of a legitimate government

policy.'" *Id.* at 140 (quotation and footnote omitted).  Plaintiff's claim, at this stage, is merely

supported by bare assertions that fall short of carrying his burden of persuasion.

      Based on the foregoing, the Court finds that plaintiff has not carried his burden of

persuasion that he is likely to succeed on the merits of this claim.


**C.**       **Irreparable harm**

      Plaintiff asserts that he is "proceeding by a Show Cause order because of <u>the imminent</u>

<u>threat of criminal prosecution</u> under the terms of the Ordinance which is unconstitutionally vague,

coercive and selectively being enforced in retaliation for exercising my First Amendment Rights."

*See* Dkt. No. 45 at 4 (emphasis in original).  Moreover, plaintiff claims that "[f]iling this case is a

First Amendment activity, and retaliatory acts by the defendants against me are intimidating and

will affect the prosecution and the outcome of the case, and I have the right to be free from arrest

and prosecution and the threat of criminal prosecution is an imminent threat."  *See id.* at 4-5.

      "The Second Circuit has defined 'irreparable harm' as 'certain and imminent harm for

which a monetary award does not adequately compensate,' noting that 'only harm shown to be

non-compensable in terms of money damages provides the basis for awarding injunctive relief.'"

*Perri v. Bloomberg*, No. 06-CV-403, 2008 WL 2944642, *2 (quoting *Wisdom Imp. Sales Co. v.*

*Labatt Brewing Co.*, 339 F.3d 101, 113–14 (2d Cir. 2003)); *see also Kamerling v. Massanari*, 295 F.3d 206, 214 (2d Cir. 2002) (holding that, "[t]o establish irreparable harm, a party seeking preliminary injunctive relief must show that 'there is a continuing harm which cannot be adequately redressed by final relief on the merits' and for which 'money damages cannot provide adequate compensation'" (quotation omitted)).  Speculative, remote, or future injury is not the province of injunctive relief.  *See Los Angeles v. Lyons*, 461 U.S. 95, 111–12 (1983); *see also Hooks v. Howard*, No. 9:07–CV–0724, 2008 WL 2705371, *2 (N.D.N.Y. Jul. 3, 2008) (holding that "[i]rreparable harm must be shown to be imminent, not remote or speculative, and the injury must be such that it cannot be fully remedied by monetary damages"); *Roucchio v. LeFevre*, 850 F. Supp. 143, 144 (N.D.N.Y. 1994) (same).

   First, to the extent that plaintiff claims that he will suffer irreparable harm because of pending criminal prosecution that he claims was brought in retaliation for various protected activities, his claim must fail.  As the Supreme Court has noted, "the 'cost, anxiety, and inconvenience of having to defend against a single criminal prosecution' was not the type of injury that could justify injunctive relief."  *Huffman v. Pursue, Ltd.*, 420 U.S. 592, 601–02 (1975) (quotation omitted).  Although plaintiff claims that he might face additional "false criminal charges" from defendants, this claim is entirely speculative and is patently insufficient to demonstrate that he is likely to suffer irreparable harm if the requested relief is not granted. Moreover, at this point, it appears as if plaintiff has merely been issued notices of violation for his failure to obtain rental certificates for three of his apartments.  The record does not indicate that any criminal proceedings have actually been brought against him.  Finally, although plaintiff is correct that the loss of First Amendment freedoms can constitute irreparable harm in certain cases, "in the preliminary injunction context, . . . 'irreparable harm c[an] only be found when

36

"First Amendment rights [a]re either threatened or in fact being impaired at the time that relief [i]s sought."'" *Everitt v. DeMarco*, 601 F. Supp. 2d 456, 463 (D. Conn. 2009) (quotations omitted). Plaintiff's fear of future retaliation by defendants is too speculative to warrant injunctive relief. *See Latino Officers Ass'n v. Safir*, 170 F.3d 167 (2d Cir. 1999) (holding that "conjectural" fear of future retaliation does not constitute irreparable harm sufficient to warrant a preliminary injunction).

Based on the foregoing, the Court finds that, in addition to failing to prove a likelihood of success on the merits of his claims, plaintiff has failed to establish that he will be irreparably harmed without preliminary injunctive relief.

### IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that plaintiff's motion for a preliminary injunction is **DENIED**; and the Court further

**ORDERS** that this case is referred to Magistrate Judge Homer for all further pretrial matters; and the Court further

 **ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: August 30, 2011
        Albany, New York

Mae A. D'Agostino
U.S. District Judge